**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------- X

PHILIP PARENTE,                        :
                                       :
           Plaintiff,           :
                                         :
             v.                  :       Case No.
                                         :
MUSEUM OF MODERN ART,       :       COMPLAINT
MICHELLE ELLIGOTT,            :
ODESSA MATSUBARA, and       :
CAROLINE CLEMENTS,          :
in their individual and professional capacities,   :
                                         :       **Jury Trial Demanded**
           Defendants.           :

-------------------------------------------------------------------------- X

Plaintiff Philip Parente hereby alleges against Defendants Museum of Modern Art ("MoMA" or the "Museum") and Michelle Elligott, Odessa Matsubara, and Caroline Clements, in their individual and professional capacities (together, "Defendants"), as follows:

## PRELIMINARY STATEMENT

1.      The Museum of Modern Art touts itself as "the preeminent preserver and presenter of modern and contemporary art and design."[1]

2.      Located just blocks from Billionaire's Row in Manhattan, MoMA operates as a not-for-profit education corporation with an endowment of over $800 million as of June 2022.[2]

3.      Relying on massive donations and its tax-exempt status as an "educational resource," MoMA acknowledges and accepts a position of public trust. Among other requirements, MoMA requires that its staff "act with integrity and in accordance with the most stringent ethical

---

[1] https://www.moma.org/momaorg/shared/pdfs/docs/about/code_of_conduct_staff_4.2014.pdf
last accessed October 23, 2023) ("Code of Conduct").

[2] https://www.moma.org/momaorg/shared/pdfs/docs/about/MoMAFY_22.pdf (last accessed
October 23, 2023).

principles, as well as the highest standards of objectivity."[3] Indeed, MoMA prepared a Code of Conduct for Staff to reaffirm its commitment to integrity and objectivity—for its Trustees, officers, committee members, volunteers, and of course, its employees.

4.      This lofty commitment is, of course, just hollow marketing material. In reality, MoMA cares little about integrity and even less about objectivity, especially when it comes to accommodating employees who have disabilities that are protected by law.

5.      Plaintiff Philip Parente worked at MoMA for 17 years. He started as an intern and worked his way up—ultimately to a position called Library Collections Coordinator. Mr. Parente consistently worked well outside of his job description, even curating an exhibition of his own and further deepening MoMA's photography book collection. In his 17-year career, Mr. Parente was an excellent employee and never faced any disciplinary issues whatsoever.

6.      Mr. Parente also suffered from supraventricular tachycardia, a serious medical condition that caused his heart to beat faster than normal. He carefully managed his medical condition with his career, but in 2021 he needed a simple, reasonable accommodation to continue performing his job.

7.      But MoMA did not care. MoMA, Mr. Parente's boss (Michelle Elligott, Chief of Archives, Library, and Research Collections[4]), MoMA's Chief Human Resources Officer Odessa Matsubara[5] (Chief Human Resources Officer), and her direct report, Benefits Manager Caroline

---

[3]  Code of Conduct.

[4]  https://www.linkedin.com/in/michelle-elligott-4669b63 (last accessed October 23, 2023).

[5]  https://www.linkedin.com/in/odessa-roberts-matsubara (last accessed October 23, 2023).

Clements[6] violated federal, state, and local law. They refused to engage meaningfully with Mr. Parente about his accommodation requests and retracted accommodations previously granted to him. They terminated his employment from his dream job. And to pile on even more, they accused him of stealing books and other materials.[7]

8.      Mr. Parente, therefore, files this Complaint to hold MoMA, Ms. Elligott, Ms. Matsubara, and Ms. Clements, accountable for their unlawful, discriminatory, and retaliatory conduct.

9.      This civil action for damages and equitable relief relies upon the Defendants' willful violations of Mr. Parente's rights that are guaranteed to him by federal, state, and local law: (i) discrimination based on disability and the failure to accommodate a reasonable accommodation under the Americans with Disabilities Act of 1990, ("ADA") as amended, 42 U.S.C. §§ 12101, *et seq.*; (ii) retaliation under the ADA; (iii) discrimination based on disability and the failure to accommodate under the New York State Human Rights Law ("NYSHRL"), Art. 15 Executive Law Sec. 296 *et seq.*; (iv) retaliation under the NYSHRL; (v) aiding and abetting discrimination under NYSHRL; (vi) discrimination based on disability and the failure to accommodate under the New York City Human Rights Law ("CHRL") § 8-107 *et seq.*, New York City Admin. Code, Ch. 1 - § 8-107; (vii) retaliation under CHRL; (viii) aiding and abetting discrimination under CHRL; (ix) interference with rights under CHRL; (x) supervisory liability under CHRL

---

[6] https://www.linkedin.com/in/caroline-fasoldt-clements-0b4b962 (last accessed October 23, 2023).

[7] Of course, Mr. Parente was not stealing. The allegedly "stolen" materials consisted of items that he was processing for the Museum, as well as personal items for which he provided actual receipts.

§ 8-107(13); and (xi) any other claims(s) that can be inferred from the facts set forth in this Complaint.

## ADMINISTRATIVE PROCEDURES

10.     On August 24, 2022, Mr. Parente filed a *pro se* Charge of Discrimination with the Equal Employment Opportunity Commission against MoMA, Charge No. 520-2022-02409.

11.     On August 18, 2023, the EEOC issued Mr. Parente a Notice of Right to Sue, attached as Exhibit A. Mr. Parente filed this Complaint within 90 days of receipt of that notice.

12.     Mr. Parente has complied with, exhausted, and otherwise satisfied all prerequisites to the filing of this lawsuit.

13.     Mr. Parente seeks attorneys' fees and costs pursuant to federal, state, and local law, including 42 U.S.C. § 12205.

## JURISDICTION AND VENUE

14.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Mr. Parente's rights under federal law. This Court has supplemental subject-matter jurisdiction over Mr. Parente's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred there. MoMA has business operations located in this District, and Mr. Parente's employment and performance occurred in this District.

## PARTIES

16.     Plaintiff Philip Parente is a native New Yorker, and he currently resides in Brooklyn. He worked at MoMA until he was terminated for failing to take the COVID-19 vaccine that his doctor advised against because of his medical condition called supraventricular tachycardia. At all relevant times, Mr. Parente met the definition of "qualified individual," "employee" and/or "eligible employee" under all applicable statutes.

17.     Defendant Museum of Modern Art is a 501(c)(3) non-profit with its principal place of business located at 11 West 53rd Street, New York, NY 10019. At all relevant times, MoMA met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

18.     At all times relevant to this Complaint, MoMA has employed twenty (20) or more employees for each working day in each of the twenty (20) or more calendar weeks in the current or preceding calendar year and meets the definition of an "employer" under ADA and all applicable state and local statutes.

19.     Defendant Michelle Elligott is Chief of Archives, Library, and Research Collections at MoMA. She resides in New York. Ms. Elligott directly participated in the discriminatory and retaliatory conduct to which Mr. Parente was subjected. At all relevant times, Ms. Elligott met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

20.     Defendant Odessa Matsubara was and is MoMA's Chief Human Resources Officer. Matsubara directly participated in the discriminatory and retaliatory conduct to which Mr. Parente was subjected. At all relevant times, Matsubara met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

21.     Defendant Caroline Clements was and is MoMA's Benefits Manager. Clements directly participated in the discriminatory and retaliatory conduct to which Mr. Parente was

subjected. At all relevant times, Clements met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

## FACTS

### A.     Mr. Parente's Love for Art

22.     Philip Parente grew up on Long Island, New York. His passion for art started early when he drew, painted, and sculpted throughout elementary and middle schools. In high school, Mr. Parente took an art class that exposed Mr. Parente to deeper and more complex approaches to art, which included trips to art museums in New York.

23.     After high school, Mr. Parente double-majored in Art History and Studio Art at Fordham University in New York. While at Fordham University, Mr. Parente also enrolled in art history courses in Rome, Italy, which often took place at some of the most historically significant locations in the art world such as Rome, Florence, Venice, and Assisi.

24.     In 2003, Mr. Parente earned his Bachelor of Arts degree from Fordham with honors.

25.     After graduating, Mr. Parente continued his education in photography by taking courses at the School of Visual Arts in New York and at the International Center for Photography.

### B.     Mr. Parente's Successful Employment at MoMA

26.     Mr. Parente started working in early 2004 at MoMA as an intern in MoMA's Library Department (which later combined into the Archives, Library, and Research Collections Department).

27.     Within a few months, MoMA offered Mr. Parente a full-time, permanent position,

as a Library Assistant. In this position, Mr. Parente's responsibilities included paging[8], shelving[9], and labeling books, and Mr. Parente often assumed new responsibilities, such as handling all of the Library's interlibrary loans and managing all of the Library's periodical subscriptions.

28.     Within about a year, MoMA promoted Mr. Parente to Senior Library Assistant. In this role, Mr. Parente's responsibilities included cataloging materials, managing the location of materials (including relocation), and managing duplicate sales. Mr. Parente also trained and supervised interns and new Library Assistants. As a Senior Library Assistant, Mr. Parente had less and less paging and shelving responsibilities, and he trained and supervised interns and new assistants who took on both paging and shelving responsibilities.

29.     In 2006, MoMA tasked Mr. Parente with a huge responsibility, despite his only two-year tenure at MoMA. He would be responsible for coordinating the Library's relocation back to Midtown following the renovation by renowned Japanese architect Yoshio Taniguchi.[10] This multi-month project required Mr. Parente to coordinate with multiple other Museum Departments and a third-party company that could appropriately handle MoMA's Library and Archival materials.

30.     This relocation project initiated Mr. Parente's stacks management work that would shape how the Library organizes and circulates its over 300,000 items for years to come.

31.     That same year, Mr. Parente received the Lee Tenenbaum Award, an extremely prestigious honor recognizing outstanding service to MoMA. Only a few staff members receive

---

[8]  Paging refers to retrieving library materials requested by a patron, which could be MoMA staff or the public. The Library and Archives stacks are closed to everyone except staff members, who pull all requests for patrons.

[9]  Shelving refers to placing recently-returned library books, magazines, files, and other materials back to the appropriate place in the library stacks.

[10]  https://www.moma.org/interactives/moma_through_time/2000/a-new-building-for-momas-75th-birthday/ (last accessed October 23, 2023).

this award each year. Upon information and belief, Mr. Parente is the only staff member from the Library Department to ever receive this award.

32.     A few years later, MoMA – this time, through the then-Chief of the Library (Milan Hughston) and the Senior Deputy Director for Curatorial Affairs (Peter Reed) – selected Mr. Parente for a sensitive and important assignment to assist Kynaston McShine in preparing one of the largest donations to the Library ever.

33.     Mr. McShine was one of MoMA's most distinguished Chief Curators, and he is widely known as the first curator of color at a major American museum. By the time he retired, he served as the Chief Curator at Large.[11]

34.     In June 2011, Mr. Parente earned a merit pay raise. He earned a second merit pay raise in July 2012.

35.     Around 2014, MoMA again selected Mr. Parente for another major project—to relocate tens of thousands of materials from the Library at the Cullman Education and Research Building in Midtown to MoMA's offsite facility in Queens. Similar to the 2006 relocation, this multi-month project also required Mr. Parente to coordinate with multiple other Museum Departments and a third-party company that could appropriately handle MoMA's Library and Archival materials.

36.     These successes formed the foundation of another promotion in 2015 when MoMA created a new position for Mr. Parente called the Library Collections Coordinator. MoMA rarely creates new positions, but Mr. Parente's excellent performance and the importance of his work to MoMA resulted in the creation of this new role for him.

---

[11] https://en.wikipedia.org/wiki/Kynaston_McShine (last accessed October 23, 2023).

37.     In this role, Mr. Parente's responsibilities included the same responsibilities as his Senior Library Assistant responsibilities except that he did less paging and shelving and started to develop the collection, host classes and other groups, and assist with reference work. He also integrated the Conservation Department's library into the Library's general collection, another major project that required months of planning and preparation.

38.     MoMA also approved Mr. Parente to acquire new materials for the Library. Mr. Parente began to acquire items from book fairs, local book dealers, as well as online stores and secondary markets. Mr. Parente also began to build new relationships with artists and publishers and acquire books directly from them, through both purchases and donations. MoMA benefited from all of this work—none of which was set forth in his official job description.

39.     In 2017, Mr. Parente, as the Library Collections Coordinator, curated his first exhibition called American Surfaces and the Photobook, which was showcased at MoMA from November 2017 to May 2018.

40.     This, again, was a monumental accomplishment. In MoMA's entire history, only a handful of Library staff members had ever curated an exhibition. More than five years later (and even though MoMA fired Mr. Parente), MoMA continues to feature Mr. Parente's work on its website.[12]

41.     Mr. Parente's exhibition also received great reviews. MoMA's then-Chief Curator of Photography, Quentin Bajac, complimented Mr. Parente on his exhibition. He also asked Mr. Parente to co-curate another exhibition with him focusing on New York-based photobooks across three decades. Elated at the news, Ms. Elligott asked Mr. Parente to share this news with the entire Archives, Library, and Research Collections Department.

---

[12] https://www.moma.org/calendar/exhibitions/3906 (last accessed October 23, 2023).

42.     Ms. Elligott also asked Mr. Parente to present the exhibition to the Library's Board of Trustees. Although the date conflicted with Mr. Parente's schedule, Ms. Elligott shared Mr. Parente's exhibition with the Library's Board.

43.     As the very next Trustee Committee Meeting approached, Ms. Elligott asked Mr. Parente to present highlights of recent acquisitions to the Library's Board of Trustees and Mr. Reed, who oversaw the Library and Archives Department. Mr. Parente's work received many compliments.

44.     In 2019, Mr. Parente earned another merit pay increase. Ms. Elligott also selected Mr. Parente to attend the largest international art fair dedicated to the photographic medium, called Paris Photo. There, Mr. Parente learned about current trends in photobook publishing and continued to acquire new items for the Library's collection. He also continued to build relationships with photographers, publishers, and book dealers.

45.     After Mr. Parente returned, Ms. Elligott again asked Mr. Parente to present acquisition highlights to the Library's Board of Trustees. Mr. Parente's presentation was so well-received that MoMA vice-chairman Kathy Fuld (wife of former Lehman Brothers CEO Richard Fuld) urged Ms. Elligott and other trustees to continue to support attendance at Paris Photo.

46.     Many Museum employees, including Ms. Elligott, knew that Mr. Parente worked well outside of his job description. In fact, Ms. Elligott acknowledged as much. During a meeting with Mr. Parente, Ms. Elligott voiced appreciation for Mr. Parente's contributions and stated that she wanted to help take some burden off his plate.

47.     But given Mr. Parente's substantial contributions (which in turn improved Ms. Elligott's standing among her superiors and the Board), Ms. Elligott never relieved him from those

extra responsibilities. He continued to work outside of his job description through early March 2020, when he started reporting to Jillian Suarez, MoMA's Head of Library Services.

48.    Like Ms. Elligott, Ms. Suarez recognized Mr. Parente's contributions. But unlike Ms. Elligott, Ms. Suarez immediately and permanently removed paging from Mr. Parente's job responsibilities, explaining that paging was below Mr. Parente's title and pay grade. Concerned with overburdening his colleagues and wanting to be a team player, Mr. Parente offered assistance with paging responsibilities. Although Ms. Suarez appreciated Mr. Parente's team-player mentality, she rejected Mr. Parente's offer. She explained to Mr. Parente that she did not want Mr. Parente paging anymore and wanted him to focus on higher-level work related to stacks management and collection development.

49.    From this point in early March 2020, Mr. Parente was never put on the paging schedule again. He only paged in emergencies to fill in for multiple colleagues being sick, on vacation, or being otherwise unavailable.

50.    Instead, as Ms. Suarez instructed, Mr. Parente focused on developing the Library's collection. By the middle of 2021, Mr. Parente was selecting approximately 10 new items for MoMA's collection on a weekly basis, possibly directing more of the Library's budget than any other staff member at MoMA.

51.    In that same year, Ms. Elligott and Clément Chéroux (then-Chief Curator of the Photography Department) asked Mr. Parente to participate in a new interdepartmental working group to plan for the future of MoMA's collections, among other strategic considerations.

52.    Also in 2021, Ms. Elligott again asked Mr. Parente to present his collection development work to the Library's Board of Trustees for the fourth time. Again, Mr. Parente received praise for his presentation.

53.     Ms. Elligott emailed Mr. Parente and the other presenters:

> Thank you so much to every one of you for making today's meeting such a success. I think it is the best meeting we have ever had, and I appreciate the work you all put into it to make it so. From coordination, tech practice, photographing books, creation of slides, graphic device for roundup section, presentations, answering questions, and phase box video -- it was all so great!

54.     Likewise, MoMA's Director Glenn Lowry, stated "What great presentations by such talented staff!! Kudos to all. G".

55.     As reflected by Mr. Parente's accomplishments, he was an excellent employee and team player. Throughout his career, he worked outside of his job description, volunteered to assist others, and mentored others. Mr. Parente never received any negative performance evaluations, and MoMA never disciplined him.

**C.     Mr. Parente Suffers from a Serious Medical Condition.**

56.     While Mr. Parente continued to achieve great success at MoMA, he also struggled with a serious medical condition called supraventricular tachycardia.

57.     Supraventricular tachycardia occurs where, in Mr. Parente's situation, electrical signals in the heart cause it to beat faster than necessary—shortening the time the heart fills itself with blood and possibly resulting in less blood pumping to the remainder of his body.

58.     Symptoms include rapid heartbeat, chest discomfort, shortness of breath, fatigue, dizziness, neck pulsations, and sudden death.

59.     When Mr. Parente started feeling these symptoms around 2011, he saw a cardiologist, Dr. Patrick Fratellone.

60.     Dr. Fratellone was not just some doctor from a Google search. He is a Fellow of the American College of Cardiology, a prestigious designation requiring a minimum of ten years of

clinical and educational preparation, peer reviews, and the passing of a rigorous two-day exam administered by the American Board of Internal Medicine.

61.      In addition, Dr. Fratellone had been treating Mr. Parente's father and mother since 2010. Although Mr. Parente's father passed away due to congestive heart failure, Mr. Parente's mother's tachychardia condition has improved significantly—eliminating almost all trips to the emergency room.

62.      Shortly after Dr. Fratellone started treating Mr. Parente's parents, Dr. Fratellone started treating Mr. Parente for his supraventricular tachycardia.

**D.      MoMA's Response to COVID-19.**

63.      As COVID-19 began to spread in March 2020, MoMA terminated 17% of its workforce[13] and started allowing other employees to work from home.

64.      MoMA did not include Mr. Parente in this layoff; instead, it approved him to work remotely for 2 to 5 days per week throughout 2020.

65.      During the holiday season in 2020, MoMA specifically asked its employees to work from home unless their work required them to be onsite. Notably, Jillian Suarez had required certain employees to work onsite 5 days per week, because their work (which included paging) actually required them to be onsite.

66.      In contrast, Mr. Parente's responsibilities no longer included paging, so his manager, Ms. Suarez, approved Mr. Parente to work from home for 4 days per week. Employees

---

[13]    https://www.theartnewspaper.com/2020/05/06/when-moma-reopens-its-budget-will-have-shrunk-by-dollar45m-and-its-staff-by-17percent (last accessed on October 23, 2023); https://observer.com/2020/05/moma-reopening-plans-45-million-budget-cuts-staff/ (last accessed on October 23, 2023).

specifically asked Ms. Suarez why Mr. Parente did not have to be present on site, and as Ms. Suarez put it, Mr. Parente's "job did not require him to be onsite."

67.     In August 2021, MoMA instituted a mandatory vaccination policy.

68.     The mandatory vaccination policy, on its face, allowed exemptions for "a qualifying disability," "sincerely-held religious belief," and "other legal basis." MoMA required any employee to request an accommodation by September 10, 2021.

69.     But while MoMA purported to be open to following the law, it was a different story behind the scenes.

70.     For example, Ms. Elligott ridiculed individuals who did not or could not get vaccinated, regardless of the reason. On one occasion, Ms. Elligott was heard making fun of the elderly family of another MoMA employee because they expressed some hesitancy around getting the vaccine.

71.     And when it came to Mr. Parente and his need for an accommodation due to his serious medical condition, MoMA did not shy away from violating federal, state, and local law.

**E.     MoMA rejects Mr. Parente's Medical Exemption Request and then attempts to humiliate him.**

72.     Consistent with MoMA's vaccination policy, Mr. Parente submitted a Request for Accommodation: Medical Exemption from Vaccination form ("Medical Exemption Request") on September 10, 2021.

73.     The Medical Exemption Request included a certification from Mr. Parente's cardiologist, Dr. Fratellone, who certified that Mr. Parente suffered from supraventricular tachycardia and that he was "contraindicated" to receiving the COVID-19 vaccine.

74.     MoMA's Benefits Manager, Caroline Clements, responded in just one business day, on September 13, 2021. She rejected Mr. Parente's Medical Exemption Request, placed him on an immediate 30-day unpaid leave of absence, and threatened termination:

> In accordance with the Keys to NYC Mandate and MoMA's Vaccination Policy based on our safety assessment, all employees must be vaccinated to enter the Museum. In order for you to perform the essential functions of your job, you must be physically present on the premises of the Museum.
>
> I have reviewed your request for a reasonable accommodation based on your medical condition. Without assessing whether your medical condition actually prohibits vaccination, we are unable to accommodate your request to work at MoMA while unvaccinated. We are willing to provide a 30 day unpaid leave of absence, starting September 14, 2021.
>
> We will pay you for today, Monday, September 13. While you remain unvaccinated, you may not report to work and will not be paid.

75.     Ms. Clements did not discuss Mr. Parente's Medical Exemption Request with him, and she did not assess whether Mr. Parente's medical condition prohibited vaccination. Rather, she summarily stated that MoMA could not accommodate Mr. Parente's Medical Exemption Request because "the essential functions of [his] job" required him to "be physically present on the premises of the Museum." Of course, Ms. Clements offered zero explanation as to why Mr. Parente had to be physically present, especially considering his actual job responsibilities and the fact that he had been working remotely for the past 18 months. MoMA also restricted him from entering any MoMA building.

76.     Ms. Clements's "take it or leave it" proposition left Mr. Parente stuck between the proverbial "rock and a hard place." He could risk his life by ignoring his cardiologist's medical advice against getting the vaccine because of his supraventricular tachycardia, or he could risk his 17-year career at MoMA to take a vaccine that could seriously injure or kill him.

77.     To make it worse, Mr. Parente's wife was pregnant in her second trimester with their second child, compounding the worry and anxiety for Mr. Parente caused by MoMA's actions.

78.     Thinking that MoMA simply misunderstood Dr. Fratellone's medical certification or made some other error, Mr. Parente met with Ms. Matsubara and Ms. Clements. Despite the fact that Mr. Parente had just been placed on unpaid leave with absolutely no notice and a threat of termination within 30 days, Ms. Matsubara and Ms. Clements showed no interest in actually engaging in a discussion about Mr. Parente's situation or any reasonable accommodations.

79.     For what Ms. Matsubara and Ms. Clements lacked in professionalism and compassion, they made up for with hostility and aggression.

80.     During the meeting, Ms. Matsubara accused Mr. Parente of stealing. The "stealing" accusations, Mr. Parente explained, stemmed from Mr. Parente's request to another MoMA colleague to bring him a box of baby wipes and photographic negatives that were part of a personal photography project after MoMA prohibited him from entering any MoMA facility.

81.     Ms. Matsubara's accusations were a clear attempt to bully, harass, and intimidate Mr. Parente for submitting his Medical Exemption Request. In Mr. Parente's entire 17-year career, he had never been accused of stealing—at least not until he submitted his Medical Exemption Request.

82.     By way of another example, Ms. Matsubara began to scrutinize Mr. Parente's work in the Library. Mr. Parente considered the unwarranted scrutiny by Ms. Matsubara odd at best, especially considering that Ms. Matsubara was a Human Resources professional with no substantive education, experience, or background that would qualify her to provide any such scrutiny. Even so, Ms. Matsubara minimized Mr. Parente's significant contributions (such as

processing the donation from Mr. McShine) by now specifically describing his work as "insignificant".

83.     After accusing Mr. Parente of stealing and after insulting his work as "insignificant," Ms. Matsubara completely shut down Mr. Parente's attempts to engage in discussion about his Medical Exemption Request. Instead, she began playing "doctor" and suggested to Mr. Parente that if he couldn't take one vaccine, perhaps he could take another.

84.     This led Mr. Parente to ask Dr. Fratellone, who submitted additional information. On October 1, 2021, Dr. Fratellone wrote:

> This is to certify that this patient should not get any vaccine after reviewing all vaccine side effects data. All vaccines have documented side effects of palpitations, arrythmia, myocarditis [inflammation of the heart muscle], and pericarditis [inflammation of the outer lining of the heart]. This patient has documented supraventricular tachycardia. He should not take any FDA approved nor non FDA vaccinations.

85.     On October 6, 2021, Ms. Clements responded:

> Thank you for having your doctor submit additional information concerning your request for an accommodation not to receive a COVID-19 vaccine. We recognize that your doctor has advised that you should not receive any of the available COVID-19 vaccinations. This advice, however, is contrary to the latest guidance from the CDC and does not appear to provide the basis for an accommodation.
>
> Even if an accommodation were warranted, however, as we stated in our response to his initial request on your behalf, all employees must be vaccinated to enter the Museum in accordance with the Keys to NYC Mandate. In order for you to perform the essential functions of your job, you must be physically present on the premises of the Museum. As a result, **there is no accommodation that we are prepared to offer you**, other than the 30-day unpaid leave that we have already offered.

(emphasis added).

86. Again, Ms. Clements summarily stated that MoMA could not accommodate Mr. Parente's Medical Exemption Request because "the essential functions of [his] job" required him to "be physically present on the premises of the Museum." And again, Ms. Clements never considered Mr. Parente's actual job responsibilities or why he needed to be physically present when he had worked remotely for the past 18 months.

87. But, for the first time, Ms. Clements – a Human Resources professional with apparently zero medical training – challenged and rejected Dr. Fratellone's medical assessment of his long-standing patient, Mr. Parente. She claimed to rely on the "latest guidance from the CDC" but she never identified the guidance, never cited to it, and never explained how Dr. Fratellone's medical assessment (that Mr. Parente should not take the vaccine because of his supraventricular tachycardia) was deficient in any regard. Simply put, Ms. Clements replaced Dr. Fratellone's medical assessment with her own lay opinion and relied on her lay opinion to reject Mr. Parente's legitimate Medical Exemption Request.

88. Facing another "take it or leave it" dilemma by Ms. Clements's stonewalling, Mr. Parente begged for assistance on October 8, 2021, from his manager, Ms. Elligott:

> As you may be aware, my cardiologist has told me that I cannot take any of the available Covid vaccines at this time due to a condition for which he has been treating me for the past 10 years. I am hopeful MoMA and I can arrive at a reasonable accommodation and I would greatly appreciate your support.
>
> I have been working from home from 2 to 5 days a week since we closed last March, and I feel as though I can perform the vast majority of my typical daily workload from home, particularly since Jillian [Suarez] has taken me off of the paging schedule. Recently, I have been dividing my time between cataloging the remainder of the Kynaston McShine donation, developing our photobook collection, and planning for the growth of our collections.
>
> I have always tried to go above and beyond what has been asked of me during my 17 years at MoMA, happily working well outside of

my job description for much of this time. Over the last few years it has been a tremendous pleasure and honor to help develop our collection, travel to Paris on MoMA's behalf, be part of the new working group with the Photography Department, and present some of my work to our Trustee Committee. I also very much look forward to continuing to work on our long term storage goals, so our collection can seamlessly grow and evolve while we share it with our staff and the greater art community.

I would greatly appreciate it if you would support an extension of my work from home, at least for a few months, after which we can meet and reevaluate. Kendra and I are expecting our second child in January, so I would be especially grateful for such an accommodation.

89.     Ms. Elligott did not provide Mr. Parente with the accommodation he requested. She did not engage in any discussion with him about any possible accommodations at that time. She offered no support whatsoever. She didn't even respond.

90.     Instead, Ms. Elligott – apparently appreciating the significance of MoMA's illegal actions – forwarded Mr. Parente's heartfelt email with an "FYI" to MoMA's top lawyer, General Counsel and Corporate Secretary James Grooms, among others.

91.     On October 9, 2021, Ms. Matsubara, as the Chief HR Officer, forwarded Mr. Parente's email to her subordinates in HR: Ms. Clements and Ms. Murphy. Despite Mr. Parente's heartfelt plea to Ms. Elligott, Ms. Matsubara exhibited zero sense of urgency, instructing her subordinates, "[D]on't read this weekend."

92.     Shortly after Mr. Parente's plea that was ignored by Defendants, he again met with Ms. Matsubara, Ms. Clements, and Ms. Elligott. Again, Ms. Matsubara completely shut down Mr. Parente's attempts to discuss his Medical Exemption Request.

93.     When Mr. Parente suggested that he would be willing to work in an unoccupied storage room on a different floor (as others had done previously), Ms. Matsubara dismissively scoffed at the idea and said, "That sounds depressing."

94.     Ms. Matsubara's flippant reaction missed the point. A number of MoMA employees had worked on various projects in that storage room, and it was a reasonable accommodation with no additional expense to MoMA to be considered. But it wasn't.

95.     By way of another example, Mr. Parente offered to be placed on an extended unpaid leave in case additional medical information became available, for example, in regard to Mr. Parente's medical condition or COVID-19, the vaccines, and their impact on heart conditions like Mr. Parente's. Again, Ms. Matsubara, Ms. Clements, and Ms. Elligott rejected Mr. Parente's attempts to find a reasonable solution, and they did not offer any suggestions for an accommodation.

96.     MoMA also refused to discuss the October 1, 2021 letter from Dr. Fratellone.

97.     Instead, Ms. Elligott attempted to humiliate Mr. Parente by pulling an about-face. In addition to repeating Ms. Matsubara's earlier criticism, Ms. Elligott began criticizing the very work she previously considered worthy enough to be presented to the Library's Board. She diminished Mr. Parente's work by claiming that her multiple requests for Mr. Parente to present his work to the Library's Board were just her attempts to "incorporate more voices" into these meetings. If that were true, why was Mr. Parente presenting on multiple separate occasions when others had never presented before? Defendants' actions were clear attempts to bully, to harass, and to intimidate Mr. Parente.

98.     In short, MoMA never budged from its refusal to accommodate Mr. Parente's supraventricular tachycardia or even its refusal to discuss possible accommodations. Instead, MoMA launched a campaign of retaliation against Mr. Parente for seeking an accommodation through his Medical Exemption Request, which included (i) the complete rescission of Mr. Parente's ability to work remotely; (ii) the unfair and unfounded criticism launched towards Mr.

Parente's work; (iii) the contest of Mr. Parente's unemployment insurance claim (which is apparently MoMA's standard practice[14]); and (iv) accusations of stealing items that he used for his work at MoMA and items that he owned.

99.     MoMA terminated Mr. Parente's employment on November 12, 2021.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of the ADA)
### *Against Defendant MoMA*

100.     Mr. Parente repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

101.     Mr. Parente claims Defendant MoMA violated Title I of the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

102.     ADA SEC. 12112. [Section 102] specifically states "(a) General Rule. - No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

103.     Defendant MoMA violated the section cited herein by failing to consider Mr. Parente's requests for a reasonable accommodation, as well as discharging Mr. Parente's employment, creating and maintaining discriminatory working conditions, and otherwise discriminating against Mr. Parente because of disabilities.

---

[14] Garcia v. Museum of Modern Art, Corp., 171 A.D.3d 1384 (N.Y. App. Div. 2019) (denying the Museum's appeal and affirming the Unemployment Insurance Appeal Board's decision to grant a former employee's application for unemployment insurance benefits).

104.     Defendant violated the above and Mr. Parente suffered numerous damages as a result.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the ADA)
#### *Against Defendant MoMA*

105.     Mr. Parente repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

106.     ADA SEC. 12203. [Section 503] states, "(a) Retaliation. - No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

107.     Defendant MoMA violated the above and Mr. Parente suffered numerous damages as a result.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of New York State Law)
#### *Against All Defendants*

108.     Mr. Parente repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

109.     Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

110.    Defendants engaged in an unlawful discriminatory practice by discriminating against Mr. Parente because of his disability, including by causing a hostile work environment based on disability, failing to accommodate Mr. Parente's request for reasonable accommodations due to disability, and wrongfully terminating Mr. Parente's employment because of his disability.

111.    Mr. Parente hereby makes a claim against Defendants under all of the applicable paragraphs of Executive Law Section 296.

### FOURTH CAUSE OF ACTION
**(Retaliation in Violation of New York State Law)**
*Against All Defendants*

112.    Mr. Parente repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

113.    New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

114.    Defendants engaged in an unlawful discriminatory practice by wrongfully retaliating against Mr. Parente.

### FIFTH CAUSE OF ACTION
**(Aiding and Abetting in Violation of New York State Law)**
*Against All Defendants*

115.    Mr. Parente repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

116.    New York State Executive Law §296(6) further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

117.    Defendants engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the discriminatory behavior as stated herein.

## SIXTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
#### *Against All Defendants*

118.    Mr. Parente repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

119.    The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

120.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, by discriminating against Mr. Parente because of his disability, including by causing a hostile work environment based on disability, failing to accommodate Mr. Parente's request for reasonable accommodations due to disability, and wrongfully terminating Mr. Parente's employment because of his disability.

121.    Mr. Parente hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
#### *Against All Defendants*

122.    Mr. Parente repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

123.     The New York City Administrative Code Title 8, §8-107(1)(e) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

124.     Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1) (e) by discriminating against Mr. Parente because of his disability, including by causing a hostile work environment based on disability, failing to accommodate Mr. Parente's request for reasonable accommodations due to disability, and wrongfully terminating Mr. Parente's employment because of his disability.

### EIGHTH CAUSE OF ACTION
**(Aiding and Abetting in Violation of the NYCHRL)**
*Against All Defendants*

125.     Mr. Parente repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

126.     The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

127.     Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful, and retaliatory conduct.

### NINTH CAUSE OF ACTION
**(Interference in Violation of the NYCHRL)**
*Against All Defendants*

128.     Mr. Parente repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

129.    Section 8-107(19), entitled Interference With Protected Rights provides that "It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section."

130.    Defendants violated the above section as set forth herein.

**TENTH CAUSE OF ACTION**
**(Supervisory Liability under the NYCHRL)**
***Against All Defendants***

131.    Mr. Parente repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

132.    Section 8-107(13) entitled Employer Liability For Discriminatory Conduct By Employee, Agent or Independent Contractor provides "An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section." B. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where: (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

133.    Defendants violated the above section as set forth herein.

## DEMAND FOR TRIAL BY JURY

134.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Philip Parente demands

a trial by jury on all claims properly triable by a jury.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.    A judgment declaring that the practices complained of herein are unlawful and in willful violation of the aforementioned federal, state, and local laws;

b.    Awarding Mr. Parente all damages (including mental and emotional distress damages);

c.    Awarding Mr. Parente compensatory damages (including front- and back pay and benefits);

d.    Awarding Mr. Parente punitive damages;

e.    Awarding Mr. Parente costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

f.    Pre-judgment and post-judgment interest, as provided by law; and

g.    Granting Mr. Parente further relief as this Court finds necessary and proper.


Dated:    October 26, 2023
          New York, New York                    Respectfully submitted,

                                                **BERLINGIERI LAW, PLLC**

                                                *Christopher J. Berlingieri*
                                                Christopher J. Berlingieri (CB 1988)
                                                244 Fifth Avenue, Suite F276
                                                New York, New York 10001
                                                Telephone: (347) 766-5185
                                                Facsimile: (914) 730-1044
                                                cjb@nyctlaw.com

                                                **SHAH LITIGATION, PLLC**
                                                Vishal H. Shah*
                                                867 Boylston Street
                                                5th Floor, No. 1893
                                                Boston, Massachusetts 02116
                                                Telephone: (617) 334-5825
                                                vishal@shahlitigation.com

                                                * pro hac vice admission to be sought

                                                *Attorneys for Plaintiff Philip Parente*

EEOC Form 161-B (01/2022)

## U.S. Equal Employment Opportunity Commission

---

### Notice of Right to Sue *(Issued on Request)*

---

| | |
|---|---|
| To: **Mr. Philip A. Parente**<br>**313 Menahan St. Apt 3R**<br>**BROOKLYN, NY 11237** | From: **New York District Office**<br>**33 Whitehall St, 5th Floor**<br>**New York, NY 10004** |

---

| EEOC Charge No.<br>**520-2022-02409** | EEOC Representative<br>**D. YOUNG,**<br>**Supervisory Investigator** | Telephone No.<br>**(929) 506-5309** |
|---|---|---|

---

*(See also the additional information enclosed with this form.)*

**Notice to the Person Aggrieved:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

More than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.***

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By: Timothy Riera
08/21/2023
_____

Enclosures(s)

**Timothy Riera**
**Acting District Director**

cc:    **Howard Robbins**
**Proskauer**
**11 TIMES SQ FL 17**
**New York, NY 10036**

Enclosure with EEOC
Form 161-B (01/2022)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***